The Honorable Karen L. Strombom

FILED _____ LODGED
_____ RECEIVED

**FEB 22 2017**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

CHARLES ANDREW STOCKER,

Defendant.

CASE NO. MJ17-5038

COMPLAINT for VIOLATIONS

18 U.S.C. § 2 (Aiding and Abetting)

18 U.S.C. § 4 (Misprision of a Felony)

BEFORE, Karen L. Strombom, United States Magistrate Judge, U. S. Courthouse, Tacoma, Washington.

The undersigned complainant being duly sworn states:

**COUNT ONE**
**(Aiding and Abetting)**

Beginning in or about September 2015 and continuing until on or about July 20, 2016, in Grays Harbor County, Washington, within the Western District of Washington, and elsewhere, the defendant, CHARLES ANDREW STOCKER, knowingly and intentionally aided and abetted the crimes, committed by two individuals (Target 1 and Target 2) and others known and unknown, of *Conspiracy to Distribute Controlled*

COMPLAINT/Stocker- 1

1   *Substances* and *Distribution of Controlled Substances,* in violation of Title 21, United

2   States Code, Sections 841(a)(1) and 846.

3       All in violation of Title 18, United States Code, Section 2.

## COUNT TWO
### (Aiding and Abetting)

6       Beginning at a time unknown, but within the last five years, and continuing until

7   on or about July 20, 2016, in Grays Harbor County, Washington, within the Western

8   District of Washington, and elsewhere, the defendant, CHARLES ANDREW

9   STOCKER, knowingly and intentionally aided and abetted the crime, committed by

10   another individual (Target 3), of *Distribution of Controlled Substances,* in violation of

11   Title 21, United States Code, Section 841(a)(1).

12       All in violation of Title 18, United States Code, Section 2.

## COUNT THREE
### (Misprision of Felony)

15       Beginning at a time unknown, but within the last five years, and continuing until

16   on or about July 20, 2016, in Grays Harbor County, Washington, within the Western

17   District of Washington, and elsewhere, the defendant, CHARLES ANDREW

18   STOCKER, having knowledge of the actual commission of a felony cognizable by a

19   court of the United States, that is, *Conspiracy to Distribute Controlled Substances* and

20   *Distribution of Controlled Substances,* in violation of Title 21, United States Code,

21   Sections 841(a)(1) and 846, did conceal the same by alerting the individuals involved in

22   this offense (Target 1 and Target 2) to law enforcement investigative efforts, and did not

23   as soon as possible make known the same to some judge or other person in civil or

24   military authority under the United States.

25       All in violation of Title 18, United States Code, Section 4.

26   //

27   //

28

## COUNT FOUR
### (Misprision of Felony)

Beginning at a time unknown, but within the last five years, and continuing until on or about July 20, 2016, in Grays Harbor County, Washington, within the Western District of Washington, and elsewhere, the defendant, CHARLES ANDREW STOCKER, having knowledge of the actual commission of a felony cognizable by a court of the United States, that is, *Distribution of Controlled Substances,* in violation of Title 21, United States Code, Section 841(a)(1), did conceal the same by alerting the individual involved in this offense (Target 3) to law enforcement investigative efforts, and did not as soon as possible make known the same to some judge or other person in civil or military authority under the United States.

All in violation of Title 18, United States Code, Section 4.

I, RICHARD C. SCHROFF, being first duly sworn on oath, depose and say:

## I.   INTRODUCTION AND AGENT'S BACKGROUND

1.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been employed as a criminal investigator with the FBI since July 2014. I am a graduate of the FBI Academy in Quantico, Virginia and have attended various other trainings such as the U.S. Department of Justice, Asset Forfeiture/Money Laundering Section's Basic Financial Investigation Seminar and the FBI Public Corruption Unit's 2016 Public Corruption Seminar.

2.      While employed by the FBI, I have investigated violent crime, cases of child exploitation, violations involving controlled substances, and other criminal matters which can generally be referred to as white collar crime. I have gained experience through training and everyday work related to conducting investigations. As a collateral duty assignment, I also serve on the FBI Seattle Division's SWAT team and assist in executing high risk search and arrest warrants. As a case agent, I have been assigned to lead an Organized Crime Drug Enforcement Task Force (OCDETF) focused on a cartel

COMPLAINT/Stocker- 3

1  affiliated drug trafficking organization and have also investigated individual drug dealers
2  responsible for distributing various controlled substances in Indian Country.  As a federal
3  law enforcement officer engaged in enforcing the criminal laws of the United States, I am
4  authorized by the Attorney General to request warrants.

5      3.      This affidavit is made based upon my personal knowledge, training,
6  experience and investigation, as well as upon information provided to me and my review
7  of reports prepared by other law enforcement personnel.  This affidavit does not include
8  each and every fact known to me concerning this investigation.  Instead, I have set forth
9  only the facts I believe are relevant to the question of whether probable cause exists to
10  believe that CHARLES ANDREW STOCKER committed the violations set forth herein.

11      4.      Specifically, I respectfully submit that there is probable cause to believe
12  that CHARLES ANDREW STOCKER has committed the crimes of *Aiding and Abetting*
13  *a Conspiracy to Distribute Controlled Substances* and *Aiding and Abetting Distribution*
14  *of Controlled Substances* by obtaining and sharing sensitive law enforcement information
15  with individuals CHARLES ANDREW STOCKER knew were involved in a conspiracy
16  to distribute controlled substances, and with an individual who CHARLES ANDREW
17  STOCKER knew was involved in the distribution of controlled substances, in violation of
18  Title 18, United States Code, Section 2.  In addition, there is probable cause to believe
19  that CHARLES ANDREW STOCKER has committed the crime of *Misprision of a*
20  *Felony* in violation of Title 18, United States Code, Section 4, by abusing his position as
21  a corrections officer employed by the City of Aberdeen Jail to obtain and share sensitive
22  law enforcement information with the targets of two narcotics investigations.

## II.      SUMMARY OF PROBABLE CAUSE.

### A.      Background of the Investigation

25      5.      In approximately March 2016, the Grays Harbor Drug Task Force (the
26  "Task Force") informed the FBI and Drug Enforcement Administration ("DEA") of
27  allegations that CHARLES ANDREW STOCKER (hereinafter "STOCKER"), an
28

COMPLAINT/Stocker- 4

1   Aberdeen Jail Corrections Officer employed by the City of Aberdeen, Washington, was

2   providing sensitive law enforcement information to known drug traffickers in Aberdeen

3   and elsewhere.

4          6.      In the preceding months, the Task Force had become concerned that

5   STOCKER might be providing sensitive information concerning its operations to others.

6   For example, in three separate interviews with confidential informants concerning drug

7   trafficking in Grays Harbor, the confidential informants told Detective Kevin Schrader to

8   be careful about sharing information with law enforcement personnel not involved with

9   the Task Force.  These confidential informants told Detective Schrader that STOCKER

10  was sharing sensitive law enforcement information with certain individuals who were not

11  law enforcement and who had no valid purpose for receiving such information.

12         7.      Over time, the Task Force saw several suspected examples of this occur

13  and affect their operations.  For example, according to the Task Force, an individual who

14  was arrested in the fall of 2015 had agreed to become an informant for the Task Force.

15  Before the informant was able to cooperate proactively, the informant was immediately

16  cut off from his drug supply, and was unable to purchase drugs from his/her supplier.

17         8.      In addition, as set forth more fully below, in the course of monitoring

18  recorded phone calls from the Grays Harbor County Jail and the Aberdeen City Jail,[1]

19  Detective Schrader became aware that STOCKER might be providing information to

20  others concerning the Task Force's use of a confidential informant to conduct a

21  controlled buy of narcotics from a suspected drug dealer, and might be passing other

22  information to known drug dealers in the area.

23  //

24  //

25

26

27

28  [1] Like other correctional facilities, these facilities record all calls made by individuals in custody at the Jail.  At the
    outset of any call, the individuals are warned that their conversations are subject to recording.

COMPLAINT/Stocker- 5

**B.      STOCKER's Assistance to Target 1 and Target 2**

**1.      The Grays Harbor Drug Task Force Drug Trafficking Investigation into Target 1 and Target 2**

9.      The Task Force, with assistance from the DEA, has been conducting an investigation into drug trafficking in Aberdeen, Washington, by a number of individuals, including two known narcotics traffickers who are working together to distribute controlled substances, including methamphetamine, in Aberdeen and Hoquiam, Washington (hereinafter "Target 1" and "Target 2").  In addition to working together to traffic in narcotics, Target 1 and Target 2 maintain a romantic relationship.

10.      Target 1 has seven felony convictions and 13 misdemeanor convictions, all of which were adjudicated in a Washington State or municipal court.  Target 1's felony convictions occurred between 1998 and 2012 and include possession of stolen property, possession of a controlled substance with no prescription, escape, forgery, burglary, theft, and residential burglary.  His/her misdemeanor convictions include numerous counts of driving with a suspended license, one count of obstructing a law enforcement officer, one count of driving under the influence, and one count of false reporting of an emergency.  Target 1 currently has charges pending against him/her for unlawful firearm possession, three counts of possession of a controlled substance, and attempt to elude.

11.      Target 2 has six felony convictions and nine misdemeanor convictions which were adjudicated in a Washington State Court.  Target 2's felony convictions occurred between 2005 and 2013 and include four convictions for possession of a controlled substance and two convictions for theft.  Target 2's misdemeanor convictions were for obstructing law enforcement, resisting arrest, theft, criminal trespass, driving with a revoked or suspended license, minor in possession of alcohol, and possession of marijuana.

COMPLAINT/Stocker- 6

12.     In approximately March or April 2015, Detective Schrader learned that Target 1 was in custody at the Aberdeen City Jail.[2]  In order to further the Task's Force investigation, Detective Schrader, who was not yet aware of the allegations concerning STOCKER's sharing of law enforcement information with those involved in the trafficking of illegal drugs, told STOCKER that Target 1 was a major drug trafficker and was the subject of an active Task Force investigation.  Detective Schrader also informed STOCKER that the Task Force wanted to listen to Target 1's recorded phone calls from the Aberdeen City Jail.

**2.      STOCKER Provided Information to Target 1 and Target 2 while Target 1 was in Aberdeen City Jail**

13.     In or about September 2015, Target 1 began serving a four-to-six month term of imprisonment at the Aberdeen City Jail.  According to Target 1,[3] he/she formed a friendship with STOCKER, and he/she was made a "trustee" of the jail, meaning he/she had special privileges such as getting out of his/her cell to help clean the jail, among other privileges.

14.     According to Target 1, in September 2015, shortly after he/she began serving his/her sentence at the Aberdeen City Jail and on a trip back to the jail from court, STOCKER told Target 1 that the Task Force was listening to Target 1's telephone calls, and that other individuals currently booked in the Aberdeen City Jail were providing the Task Force with information about Target 1.

15.     In addition, Target 2 told me that he/she had a similar conversation with STOCKER outside the Aberdeen City Courthouse in which STOCKER told Target 2 that the Task Force was listening to Target 1's telephone calls and to be careful.  I am aware,

[2] Target 1 was arrested on three occasions in March and April 2015, and was in custody for only relatively short periods of time for each arrest.
[3] Target 1 began cooperating with the investigation after he/she was arrested by the Hoquiam Police Department in July 2016 for possession with intent to distribute controlled substances and possession of a firearm.  In exchange for his/her continuing cooperation, the United States has agreed not to charge Target 1 federally for the July 2016 incident.  Target 1 currently faces charges in the State concerning the incident, and the United States has made no promises to Target 1 concerning the State's charges.

COMPLAINT/Stocker- 7

1  based upon discussions with the Task Force and others, that Target 2 was actively selling
2  drugs during the fall of 2015, while Target 1 was in jail.  Target 2 told me that this was
3  how he/she made a living.

4      16.    In addition to telling Target 1 and Target 2 that the Task Force was
5  listening to Target 1's telephone calls, STOCKER assisted Target 1 in obtaining a
6  furlough from jail to which he was not entitled.  Specifically, Target 1 asked STOCKER
7  whether Target 1 could get a furlough in order to get married [to Target 2].  In response,
8  STOCKER told Target 1 that the only way Target 1 could get out of jail was to fake a
9  heart attack.  Thereafter, and at STOCKER'S direction, Target 1 faked a heart attack and
10  was granted a two-week furlough.  In addition to this two-week furlough, STOCKER
11  approved other, shorter furloughs for Target 1 during this period of incarceration.  In
12  total, Target 1 believes he/she had five to six furloughs during this time.  Target 1 was
13  granted these furloughs even though he/she previously escaped from the Aberdeen City
14  Jail in 2006.  Target 1 admitted that he/she was selling drugs while out on furloughs.[4]

15      17.    Because of his/her prior escape, Target 1 was required to call in to the jail
16  every day to check in when he/she was on furlough.  According to Target 1, Target 1
17  would frequently communicate with STOCKER during these calls.  In one instance,
18  which Target 1 believed to have happened around Christmas 2015, Target 1 asked
19  STOCKER if Target 1's name had come up around the jail or the police station.  In
20  response, STOCKER told Target 1 that the Task Force had called and asked if Target 1
21  was still in jail, and that STOCKER had told the Task Force Target 1 was out on
22  furlough.

23      18.    On another occasion, Target 1 asked STOCKER to look Target 1 up in a
24  Department of Corrections database to see if Target 1 had any outstanding warrants or
25  holds.  STOCKER told Target 1 that he did not have access to that database.

26

27

28  [4] Target 1 could not recall on which furloughs he/she was dealing drugs, but stated that he/she did not think it was
on the first few furloughs.

COMPLAINT/Stocker- 8

19.     In addition to providing this information to Target 1, STOCKER also offered to hold cash for Target 1. According to Target 1, STOCKER knew that it was likely that Target 1 would be going to prison and likely knew that Target 1's money was obtained from the sale of drugs. During one of the communications between Target 1 and STOCKER, STOCKER offered to hold onto Target 1's cash while Target 1 was in custody.

20.     Finally, on January 30, 2016, Detective Schrader listened to a telephone call from the Aberdeen City Jail from Target 1 to Target 2. In the call, Target 1 discussed missing a court appearance, and asked Target 2 if he/she had called STOCKER, and Target 2 informed Target 1 that Target 2 had not.

**3.     STOCKER Continued to Assist Target 1 and Target 2 after Target 1 was Released from Aberdeen City Jail**

21.     According to Target 1, after he/she was released from the Aberdeen City Jail in approximately January 2016, STOCKER continued to provide assistance to Target 1 and Target 2 by giving them sensitive law enforcement information and offering to hold cash for Target 1.

22.     During the investigation, Detective Schrader reviewed the Grays Harbor County's listing of employee emergency contact telephone numbers to determine STOCKER's telephone number, and confirmed his cell phone as 360-xxx-xx88 ("STOCKER's telephone"). The Task Force then obtained telephone toll records for the time period between February 9, 2016, and March 10, 2016, for Target 1's telephone number. The toll records indicate that Target 1's telephone and STOCKER's telephone had 31 contacts (including phone calls and text messages) in the one-month period. In addition, I obtained records from the installation of the pen register and trap and trace device. These records show that STOCKER and Target 1 continued periodic communication with one another in the late spring and early summer of 2016. Information obtained pursuant to the order authorizing the pen register and trap and trace

COMPLAINT/Stocker- 9

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  device, including historical call data, indicated that Target 1 and STOCKER

2  communicated with one another on 14 additional occasions.

3       23.    According to Target 1, from approximately January 2016 to his/her arrest in

4  July 2016, Target 1 asked STOCKER on five to ten occasions whether STOCKER had

5  heard anything about Target 1, such as whether Target 1 was being watched by law

6  enforcement.  In response, STOCKER told Target 1 that he had heard Target 1 and

7  Target 2's names around the station.

8       24.    According to Target 2, in approximately March or April 2016, Target 1 and

9  Target 2 had a conversation concerning STOCKER holding cash for Target 1.  According

10  to Target 2, Target 1 told him/her that STOCKER was holding onto $10,000 in cash that

11  was Target 1's share of their jointly earned profits from selling drugs.  During the

12  investigation, this information was corroborated by a Task Force informant who reported

13  that Target 2 was upset that Target 1 had given Target 1's cash to STOCKER.  Target 1

14  has denied providing STOCKER with any cash during this time period, and asserted that

15  he/she only gave STOCKER the cash in the controlled delivery at the FBI's direction

16  which is discussed below.

17       25.    On or about July 16, 2016, approximately eight days after Target 1 agreed

18  to cooperate in the FBI's investigation into STOCKER's conduct, STOCKER called

19  Target 1.  Target 1 reported that, in this telephone call, STOCKER told Target 1 that the

20  Task Force was trying to set Target 1 up with ten pounds of methamphetamine.  In an

21  interview, Target 2 told me that he/she remembered receiving a call from Target 1 at

22  some point in time concerning ten pounds of methamphetamine.  Specifically, Target 2

23  said that Target 1 called him/her and asked if Target 2 had recently sold ten pounds of

24  methamphetamine to anyone.  Target 1 also told Target 2 that STOCKER was the one

25  who was asking.

26       26.    According to Target 1, STOCKER provided this assistance to Target 1 and

27  Target 2 because they were friends. Both Target 1 and Target 2 denied ever providing

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  money or anything of value to STOCKER in exchange for the information STOCKER
2  provided or STOCKER's offer to hold cash for Target 1.

3  **C.      STOCKER's Assistance to Target 3**

4        27.      In early 2016, the Task Force was investigating Target 3, an individual
5  who the Task Force believed was obtaining drugs from a source of supply and then
6  reselling them to support Target 3's own drug abuse problem.

7        28.      As part of its investigation, the Task Force identified a confidential
8  informant ("Informant A") as an individual who could possibly purchase drugs from
9  Target 3. Specifically, in January 2016, Informant A called Detective Schrader using the
10 Aberdeen City Jail telephone after being arrested for shoplifting because Informant A
11 wanted to offer to assist the Task Force in exchange for leniency. During the call,
12 STOCKER took the phone from Informant A, and told Detective Schrader that Informant
13 A had not intended to call Detective Schrader and apologized. Thus, STOCKER knew of
14 Informant A's attempt to contact Detective Schrader in order to provide assistance to the
15 Task Force.

16       29.      In March 2016, Detective Schrader was monitoring phone calls made from
17 the Grays Harbor County Jail to Target 2 as part of the Task Force's investigation. On
18 February 17, 2016, Target 3, who was in custody at Grays Harbor County Jail made a
19 telephone call to Target 2's phone number.

20       30.      According to Detective Schrader, Target 1 answered the phone call. In the
21 phone call, Target 1 told Target 3 that a "mutual friend" from Aberdeen wanted Target 1
22 to tell Target 3 that Informant A was planning to do a controlled purchase of drugs from
23 Target 3. Target 1 also told Target 3 that the person Target 1 received the information
24 from was "100 percent reliable." Target 1 concluded the call by telling Target 3 that the
25 two could discuss the matter further in person, after Target 3 was released from the Grays
26 Harbor County Jail the following day. Target 1 also gave Target 3 his/her telephone
27 number.

28

COMPLAINT/Stocker- 11

31.     According to the Task Force, at the time of the call between Target 1 and Target 3, the Task Force was indeed planning to use Informant A to purchase drugs from Target 3.

32.     As part of my investigation, I have interviewed Target 1 and Target 3 concerning this incident.  Target 1 confirmed that STOCKER was the "mutual friend" in Aberdeen who told Target 1 that the Task Force intended to use Informant A to conduct a controlled buy of drugs from Target 3.  According to Target 1, STOCKER asked Target 1 to make contact with Target 3 to inform Target 3 about the proposed law enforcement operation.  Specifically, Target 1 stated that STOCKER told Target 1 that Target 3 was in the Aberdeen City Jail, but that the Department of Corrections had picked up Target 3 and taken him/her to the County jail.  STOCKER also told Target 1 that there was no way for STOCKER to get in touch with Target 3, and STOCKER wanted to let Target 3 know that the Task Force was going to use Informant A to do a controlled buy from Target 3.

33.     Target 1 stated that he/she agreed to provide the information to Target 3.  Target 1 said that he/she sent a letter to Target 3 in the county jail which directed Target 3 to call Target 1.  Target 1 confirmed that Target 3 and he/she are the voices on the recorded call concerning the "mutual friend" from Aberdeen.

34.     Target 3 also confirmed that he/she received a letter from Target 1 while Target 3 was in custody in the Grays Harbor County Jail directing Target 3 to call Target 1.  Target 3 said he/she called Target 1 the next day, and confirmed that the voices on the recording were of Target 1 and Target 3.  Target 3 also stated that after he/she received the information from Target 1, Target 3 met up with Target 1 to talk.  According to Target 3, Target 1 told him/her that STOCKER had provided the information to Target 1 to pass to Target 3.  Target 3 admitted that he/she was selling drugs at this time, and stated that he/she did not sell any drugs to Informant A because of the information STOCKER provided to him.

35.     When asked why STOCKER would provide this information to Target 3, Target 3 stated that on prior occasions he/she had dealt drugs to STOCKER's son, D.S.,

COMPLAINT/Stocker- 12

1  before Target 3 knew that STOCKER was D.S.'s father.  When Target 3 realized that
2  STOCKER was D.S.'s father, he/she stopped selling to D.S.  According to Target 3, after
3  he/she stopped selling to D.S., but before STOCKER provided the information
4  concerning Informant A, Target 3 was in custody in Aberdeen City Jail and STOCKER
5  thanked Target 3 for not selling drugs to D.S.

6       36.     In June 2016, Sergeant Joe Strong, the supervisor of the Task Force, and I
7  interviewed another informant ("Informant B") who was working for the Task Force.
8  Informant B said he/she was present when Target 3 discussed how STOCKER had told
9  Target 3 that Informant A was an informant working for the Task Force and intending to
10 conduct controlled drug purchases from Target 3.  Informant B said Target 3 claimed to
11 have told STOCKER that he would prevent the sale of heroin to STOCKER's son in
12 exchange for STOCKER's assistance and information.  Further, Informant B informed
13 me that two individuals sought retribution against Informant A for his affiliation with law
14 enforcement by attempting to run Informant A off the road and physically assaulting
15 Informant A on several occasions.

16 **D.     STOCKER Did Not Report the Felony Drug Trafficking Committed by
17 Targets 1, 2, or 3 to Law Enforcement**

18      37.     As part of my investigation, I searched internal FBI databases and
19 confirmed that STOCKER never reported the felonies of conspiracy to distribute
20 controlled substances or the distribution of controlled substances by Target 1, Target 2, or
21 Target 3 to the FBI.  Similarly, I contacted the DEA Special Agent who works with the
22 Task Force to determine if STOCKER made any report of Target 1, Target 2, or Target
23 3's felonies to the DEA.  The DEA confirmed that STOCKER never reported Target 1,
24 Target 2, or Target 3's commissions of a felony to law enforcement.

25      38.     In addition, I confirmed with the Task Force and STOCKER's supervising
26 Captain at the Aberdeen Police Department that STOCKER never informed any member
27 of the Task Force or his supervisor Target 1, Target 2, or Target 3's felonies.  I also
28 reviewed a number police incident reports from Grays Harbor County.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

39.    Grays Harbor County uses a law enforcement reports database called Spillman.  Spillman allows authorized users the ability to create incident numbers, list individuals involved with an incident, and to write a narrative report of what occurred during the incident. It also allows users to conduct searches for incidents using search fields such as name, date of birth, social security number, incident number, date of incident, and a number of other fields. As a result of the volume of information that is entered in Spillman and the ability to search law enforcement incidents, it is easy to conduct targeted searches for incidents and who was involved in them.

40.    With assistance from the Task Force, I conducted various searches in Spillman to determine if STOCKER ever reported any felonies committed by Target 1, Target 2, or Target 3.  In the search returns, I reviewed the listings of individuals involved with the incidents in order to determine if STOCKER had ever reported any of Target 1, Target 2, or Target 3's illegal activity to law enforcement officials, either as a private citizen or in his role as a corrections officer for the City of Aberdeen.  As set forth in the next paragraph, I was unable to find any reports filed by STOCKER relating to any felonies committed by Target 1, Target 2, or Target 3.

41.    The first set of reports I searched were for incidents STOCKER was involved in using his nickname, "Andy Stocker." In this search field, there were no mentions of Target 1, Target 2, or Target 3.  The second set of reports I searched were for incidents STOCKER was involved in using his full name, "Charles Andrew Stocker." In this search field, there were no mentions of Target 1, Target 2, or Target 3. The third set of reports I searched were for incidents STOCKER was involved in as a "responding officer," meaning he was a law enforcement employee that was involved in an incident. In this search field, there were no mentions of Target 1, Target 2, or Target 3. The fourth set of reports I searched were for incidents STOCKER was involved as the "reporting officer," meaning that he was the law enforcement employee that was responsible for the reporting of a given incident. In this search field, there were no mentions of Target 1, Target 2, or Target 3.

COMPLAINT/Stocker- 14

**E.**     **Target 1 Agrees to Make Recorded Calls and Meetings with STOCKER.**

42.     After Target 1 agreed to cooperate with law enforcement, I asked Target 1 if he/she was willing to call STOCKER and ask him to hold onto money for him/her. Target 1 indicated that he/she was and signed an FBI form FD-472 providing his/her permission to record that phone call. Target 1 then contacted STOCKER by calling STOCKER's telephone.

43.     STOCKER answered the phone and said that he was currently at work. I knew STOCKER to be working at Aberdeen City Jail, as I had previously received his work schedule from the Aberdeen Police Department. During the phone call, Target 1 asked STOCKER if he remembered that he had previously offered to hold onto something for Target 1. STOCKER said that he did, and Target 1 then asked STOCKER if he would be willing to hold onto some money for Target 1. STOCKER agreed and Target 1 asked how he/she could get the money to STOCKER. STOCKER said he/she would need to call him back later. This conversation was captured on two recording devices in use by the FBI.

44.     Later on the evening of July 8, 2016, STOCKER called Target 1 from STOCKER's telephone. At my direction, Target 1 did not answer the phone call. In subsequent text messages the two agreed to speak a short time later that evening. A short time later, Target 1 called STOCKER's telephone and STOCKER answered the phone. STOCKER said that he wanted to discuss Target 1's request in person, not over the telephone. STOCKER said that he was still at work but that Target 1 could stop by the Aberdeen City Jail to discuss the request or wait until STOCKER left work at 11 p.m. that night. Target 1 later informed STOCKER by text message that he/she would not be able to meet that night but would get in touch with STOCKER again soon.

45.     On July 11, 2016, members of the Task Force and I met again with Target 1. Target 1 said STOCKER had tried to call him/her over the weekend but that he/she had not answered his phone. Target 1 agreed to meet with STOCKER in person to discuss STOCKER holding money for Target 1 and record their meeting.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    46.    That day, Target 1 met with STOCKER at STOCKER's t-shirt business.
2  This conversation was recorded by the FBI with the consent of Target 1 using equipment
3  provided by the FBI and worn on Target 1's person.  During the conversation, Target 1
4  explained to STOCKER that he/she had been pulled over and arrested on Friday, July 8,
5  2016.  While discussing Target 1's traffic stop, a portion of the conversation went as
6  follows:

7        **STOCKER:** The day you called me, people were calling looking for you.
8        **TARGET 1:** Yeah…
9        **STOCKER:** Lots of people, I mean, it's like, "'hey you got [Target 1] in
10       custody?' No, why?"

11   47.    Target 1 and STOCKER then discussed a previous incident where Target 1
12  was arrested and released without charges.  Target 1 told Stocker that the July 8, 2016
13  arrest was like an incident last year where he/she was pulled over and arrested with
14  another individual and then released without any paperwork.  Target 1 said in that
15  incident, "I had….whatever was in the console, you know what I mean?"  Based on my
16  training and experience, I believe that Target 1 was referring to illegal contraband, such
17  as drugs or a firearm.  The conversation then continued with the following:

18       **STOCKER:** So, if you, if you think you're going to be going away?
19       **TARGET 1:** Well, I'm thinking something is going to happen, so…
20       **STOCKER:** Like I said, I don't want to know. I don't want to know nothing. Just,
21       if you want me to hold something for you, I'll probably do it. I'll put it in my safe
22       at home. It's safe.  And, uh, I mean, I guess I can find out how much time you get
23       through [Target 2].
24       **TARGET 1:** Yeah, well yeah, yeah [Target 2] would know. Right, I mean, yeah
25       yeah [Target 2 will] know…

26   48.    Target 1 and STOCKER then discussed whether or not Target 1 should tell
27  Target 2 about the money Target 1 would be leaving with STOCKER.  Target 1 said that
28  he/she would not want Target 2 going to STOCKER for money and would not want

COMPLAINT/Stocker- 16

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   STOCKER providing the money to anyone without Target 1's permission.  STOCKER

2   showed concern that holding the money for Target 1 could be used against STOCKER in

3   the following exchange:

> **STOCKER:** I'm just saying, say for instance you were to want me hold a bunch
>
> of money and then [Target 2] would come to me and say, "Hey. I want a thousand
>
> bucks," and I'm like, hmm Fuck you…
>
> **TARGET 1:** Yeah no
>
> **STOCKER:** Would it be best just not to even fucking tell [Target 2] that way that
>
> [Target 2] can't use it against me and go either give me the thousand dollars…
>
> **TARGET 1:** Yeah or I'm gunna fucking…
>
> **STOCKER:** Yeah you see what I'm saying?
>
> **TARGET 1:** Yeah

13      49.    Target 1 and STOCKER then decided that Target 2 should not know

14   STOCKER was holding the money and went on to further discuss the logistics of how

15   STOCKER would receive and store the money.  STOCKER said, "What I could do is, I

16   could take that money, say it is, I'll seal it and it just remains sealed and, I'll ter [sic]…

17   I'll, I'll put it in the safe and…it's gone."  The two also discussed what would be done if

18   something happened to STOCKER, such as STOCKER getting into a car accident.

19   Target 1 told STOCKER that the amount of money would probably be at least $10,000,

20   to which STOCKER replied, "That's nothing."  STOCKER then said that he had that

21   much money there in his office safe.  STOCKER then told Target 1, "that's my safe," and

22   "I've got a safe inside that safe…"  They discussed Target 1 buying a briefcase safe that

23   Target 1 could put the money into or a fireproof lockbox.

24      50.    After discussing STOCKER's potential to hold money for Target 1,

25   Target 1 asked "you haven't heard anything have you? Anything about, nothing going

26   around the fucking…?"  STOCKER said that he had not but it has been busy, "down

27   there."  In my training and experience, I believe STOCKER was referencing the

28   Aberdeen City Jail.   STOCKER said he had been on vacation and has an additional

COMPLAINT/Stocker- 17

1 | period of vacation coming up but he had not heard anything about Target 1.  STOCKER
2 | then said that the Task Force had been really busy lately doing controlled buys but the
3 | Task Force did not tell him anything.  STOCKER also said there was an informant that
4 | meets with a member of the Task Force who parked his/her car in the rear of the
5 | Aberdeen Police Station, but STOCKER did not know who the informant was. Target 1
6 | then said, "I mean, you just gotta assume that everyone is a fucking…" to which
7 | STOCKER interrupted by saying, "yeah, you do! You really do. They'll sell you all out."

8 |      51.    Target 1 and STOCKER continued to make small talk for a brief period of
9 | time before beginning to end the conversation as follows:

10 |     **STOCKER:** Yeah so just let me know
11 |     **TARGET 1:** Yeah, yeah, it'll probably be…
12 |     **STOCKER:** …like I said what I would probably do is you just leave me that and
13 |     I'll have the instructions if something happens to me, then it, it goes.
14 |     **TARGET 1:** Ok
15 |     **STOCKER:** But
16 |     **TARGET 1:** Yeah…[mumbling]…I mean I'm not just going to bring it in here in
17 |     a fucking…yeah just bring it in? Ok
18 |     **STOCKER:** Yeah, call me before you do it
19 |     **TARGET 1:** Right
20 |     **STOCKER:** Then, ya know, I can…I can put it.
21 |     **TARGET 1:** yeah
22 |     **STOCKER:** Then I can put it in there.
23 |     **TARGET 1:** Yeah ok
24 |     **STOCKER:** Just, ya know, whatever…whatever you're going to have in there I
25 |     don't care. Whatever, I don't really want to know. I mean, if you want me to have
26 |     the combination or a key to it let me know, and then ya know 'cause if someone
27 |     needs, if you're gonna…
28 |     **TARGET 1:** Yeah

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   **STOCKER:** Should there be a reason to take money out of it? Not really?

2   52.   After some additional brief discussion, I heard Target 1 stand and begin

3   walking.  There was then some small talk before Target 1 departed.  I observed Target 1

4   exit STOCKER's business and leave the area in his vehicle at approximately 5:06 p.m.

5   **F.   Target 1 Meeting with Stocker – Execution of Search Warrant.**

6   On July 20, 2016, FBI Special Agents and Task Force Officers conducted an operation

7   which involved providing STOCKER with an opportunity to take money and contraband

8   (fake methamphetamine) from Target 1 and the execution of search warrants at

9   STOCKER's home and business.  In that operation, Target 1 was acting at the direction

10  of the FBI.  Target 1 contacted STOCKER by telephone and set up a meeting for between

11  1:30 p.m. and 2:30 p.m. that day so that STOCKER could "hold onto" the money that

12  they had discussed on July 11, 2016.  During their phone conversation, STOCKER asked

13  Target 1 to meet him in a secluded area of a parking garage located across the alley

14  behind STOCKER's personal t-shirt business.

15  53.   Target 1 met with members of the Task Force and me prior to meeting with

16  STOCKER.  Target 1 and his/her vehicle were searched for the presence of contraband or

17  money.  Target 1 was then provided with a green bag containing $4,000 and ¾ of a pound

18  of fake methamphetamine, along with FBI recording and tracking equipment.  Target 1

19  then met STOCKER in the parking garage behind STOCKER's business.  According to

20  Target 1, STOCKER was waiting in the parking garage when he arrived.  As STOCKER

21  approached Target 1's vehicle, STOCKER said something to Target 1.  Target 1 believed

22  STOCKER said, "don't call or text me."  I have reviewed the audio recording of their

23  meeting and believe STOCKER told Target 1 to text message STOCKER to say that

24  Target 1 could not make their meeting.  Target 1 then told STOCKER, "There is not just

25  fucking cash in there, there is dope in there and shit…so don't…".  Target 1 informed me

26  that when he said this to STOCKER, the bag was still in Target 1's possession.  Target 1

27  said that STOCKER acknowledged what Target 1 had said and then took the bag from

28  him.  Target 1 then told STOCKER that he would come back for it later.  Simultaneously

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    and in part talking over Target 1, STOCKER repeated to Target 1 his request about text

2    messaging him.  A member of the surveillance team then saw STOCKER run across the

3    alley from the parking garage and into the rear of his business.

4         54.    Immediately following Target 1's passing the bag containing money and

5    fake methamphetamine, law enforcement officers conducted a search of STOCKER's

6    residence and business, pursuant to search warrants obtained from the Honorable J.

7    Richard Creatura, Magistrate Judge for the U.S. District Court for the Western District of

8    Washington.  The law enforcement officers also searched STOCKER's vehicle, pursuant

9    to his written consent.  During their searches, the Agents found and seized $840 from the

10   center console of STOCKER's vehicle, $5,835 from a safe located at STOCKER's

11   business, $1,230 from a safe located at STOCKER's residence, the green bag containing

12   $4,000 and fake methamphetamine from a table at the rear of STOCKER's business, and

13   STOCKER's personal cellular telephone.

14   **G.    Interview of Stocker – False Statements.**

15        55.    Concurrent with the search, I interviewed STOCKER.  I advised

16   STOCKER of his *Miranda* rights using an FBI form FD-395, Advice of Rights form,

17   which STOCKER read and signed, indicating his willingness to speak to me without an

18   attorney present.  The interview was recorded with STOCKER's knowledge.

19        56.    During the interview, I questioned STOCKER about the nature of his

20   relationship with Target 1, his agreement to accept and hold onto money for Target 1, his

21   passage of law enforcement information concerning Informant A to Target 3 through

22   Target 1, his providing favors to Target 1 and other inmates at the Aberdeen City Jail, his

23   use of law enforcement databases, and his relationship with female prisoners.

24        57.    During the interview, STOCKER made the following statements and

25   assertions:

26             a.    STOCKER falsely claimed that he and Target 1 never discussed a

27   specific amount of money for STOCKER to hold onto.  He said he assumed it was money

28   and even assumed it was "like" $1,000 but they never discussed a specific dollar amount.

COMPLAINT/Stocker- 20

1        b.     Stocker falsely denied having any specific knowledge of Task Force

2 activity.

3        e.     Stocker acknowledged knowing Informant A and stated, "Informant

4 A is a piece of shit, period!" Stocker also disparaged Informant A for working with the

5 Task Force saying he cannot do his time, "like a man."

6        f.     Stocker vehemently and specifically denied providing information

7 concerning controlled buys to Target 3 via Target 1. STOCKER stated, "I have never

8 told them about anything. I don't know anything about controlled buys." As set forth

9 above, this was false.

10        g.     STOCKER stated that Target 1 asked if he had heard Target 1's

11 name come up in law enforcement circles and STOCKER said he replied, "…nope,

12 haven't heard your name." STOCKER said he never looked up warrants or law

13 enforcement interest for Target 1.

14     58.     In conclusion, I believe there is probable cause to believe STOCKER has

15 committed the following crimes:  1) aiding and abetting Target 1 and Target 2's

16 Conspiracy to Distribute Controlled Substances and Distribution of Controlled

17 Substances, in violation of Title 18, United States Code, Section 2; 2) aiding and abetting

18 Target 3's Distribution of Controlled Substances, in violation of Title 18, United States

19 Code, Section 2; 3) misprision of a felony, in that STOCKER, a corrections officer knew

20 that Target 1 and 2 had conspired to distribute controlled substances and distributed

21 controlled substances and, rather than report these violations to law enforcement, he took

22 steps to conceal the commission of these felonies from law enforcement; and 4)

23 misprision of a felony, in that STOCKER, a corrections officer, knew that Target 3

24 distributed controlled substances and, rather than report this violation to law enforcement,

25 he took steps to conceal the commission of these felonies from law enforcement.

26     Based on the above facts, I respectfully submit that there is probable cause to

27 believe that CHARLES ANDREW STOCKER did knowingly and intentionally commit

28

COMPLAINT/Stocker- 21

1  the crimes of *Aiding and Abetting*, in violation of Title 18, United States Code, Section 2,

2  and *Misprision of Felony*, in violation of Title 18, United States Code, Section 4.

3

4

5  Richard C. Schroff, Complainant
   Special Agent, FBI

6

7

8       Based on the Complaint and Affidavit sworn to before me, and subscribed in my

9  presence, the Court hereby finds that there is probable cause to believe the Charles

10 Andrew Stocker committed the offenses set forth in the Complaint.

11     Dated this ___2nd___ day of February, 2017.

12

13

14

15 KAREN L. STROMBOM
   United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT/Stocker- 22